**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

LARRY ELLIS,              §
                                  §
         *Plaintiff*,        §
                                  §
*versus*                    §        CIVIL ACTION NO. H-08-2360
                                  §
MICHAEL J. ASTRUE, Commissioner    §
of the Social Security Administration,    §
                                  §
         *Defendant*.       §

**MEMORANDUM AND ORDER**

Pending before the court are Plaintiff Larry Ellis' ("Ellis") motion for summary judgment and

Defendant Michael J. Astrue's, Commissioner of the Social Security Administration (the

"Commissioner"), response to his motion for summary judgment. Ellis appeals the determination

of an Administrative Law Judge ("ALJ") that he is not entitled to receive Title II disability insurance

benefits or Title XVI supplemental security income ("SSI") benefits. *See* 42 U.S.C. §§ 416(I), 423,

1382c(a)(3)(A). Having reviewed the pending motions, the submissions of the parties, the pleadings,

the administrative record, and the applicable law, this Court is of the opinion that Ellis' Motion for

Summary Judgment (Docket Entry No. 14) should be denied, and the Commissioner's decision

denying benefits be affirmed.

**I.**     <u>***Background***</u>

On October 22, 2004, Ellis filed an application for disability insurance benefits and SSI

benefits with the Social Security Administration (SSA), claiming he had been disabled and unable

to work since February 1, 2002, due to diabetes mellitus[1] and bipolar disorder.[2]  (R. 25, 44, 45).

Both applications were denied at the initial and reconsideration levels.  (R. 46-52, 54-60).

Ellis requested, and was granted, a hearing before an ALJ to review the decisions. (R. 36-42).

A hearing was held on September 11, 2006, in Houston, Texas, at which time the ALJ heard

testimony from Ellis and Karen E. Nielsen, a vocational expert ("VE").  (R. 342-385).  In a decision

dated October 18, 2006, the ALJ denied Ellis' applications for benefits.  (R. 25-30).  On October 30,

2006, Ellis appealed the decision to the Appeals Council of the SSA's Office of Hearings and

Appeals.  (R. 19-21).  After receiving and considering supplemental evidence (including a Brief in

Support for AC Review), the Appeals Council, on June 15, 2007, denied Ellis' request to review the

ALJ's determination.  (R. 12-14).  This rendered the ALJ's opinion the final decision of the

Commissioner.  *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).  On July 28, 2008, Ellis filed a

complaint in this Court, seeking judicial review of the ALJ's decision.  (Docket Entry No. 1).

## II.  *Analysis*

### A.  *Statutory Bases for Benefits*

SSI benefits are authorized by Title XVI of the Act and are funded by general tax revenues.

*See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001).

The SSI Program is a general public assistance measure providing an additional resource to the aged,

---

[1]  "Diabetes mellitus" is a chronic syndrome of impaired carbohydrate, protein, and fat metabolism owing to insufficient secretion of insulin or to target tissue insulin resistance.  Type 2 is usually onset between 50 and 60 years of age.  There is no need for insulin injections, and dietary control is usually effective. Obesity and genetic factors may also be present. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 489-490 (29th ed.  2000).

[2]  "Bipolar disorder" refers to mood disorders characterized by a history of manic, mixed, or hypomanic episodes, usually with concurrent or previous history of one or more major depressive episodes, including Bipolar I disorder, Bipolar II disorder, and Cyclothymic disorder.  *See* DORLAND'S, *supra*, at  528.

blind, and disabled to assure that their income does not fall below the poverty line. *See* 20 C.F.R. § 416.110. Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). A claimant applying to the SSI program cannot receive payment for any period of disability predating the month in which he applies for benefits, no matter how long he has actually been disabled. *See Brown v. Apfel*, 192 F.3d 492, 495 n.1 (5th Cir. 1999); *see also* 20 C.F.R. § 416.335. The applicable regulation provides:

> When you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application. If you file an application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month.

20 C.F.R. § 416.335. Thus, the month following an application, here, November 2004, fixes the earliest date from which benefits can be paid. (R. 63-67). Eligibility for SSI payments, however, is not dependent on insured status. *See* 42 U.S.C. § 1382(a).

Social Security disability insurance benefits are authorized by Title II of the Act and are funded by Social Security taxes. *See also* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100. The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence. A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application. *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger*, 516 F. 2d 1005, 1007 n.1 (5th Cir. 1975); *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997). For purposes of Title II disability benefits, Ellis was insured through September 30, 2006. (R. 25). Consequently, to be eligible for disability benefits, Ellis must prove that he was disabled prior to that date.

3

While these are separate and distinct programs, applicants seeking benefits under either statutory provision must prove "disability" within the meaning of the Act, which defines disability in virtually identical language for both programs.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a).  Under both provisions, disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(A).  Moreover, the law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI.  *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995).

**B.**     ***Standard of Review***

    **1.**     ***Summary Judgment***

The court may grant summary judgment under Fed. R. Civ. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case.  If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case.  *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991).  When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's

position.  *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000).  If there are no issues of material fact, the court shall review any questions of law *de novo*.  *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).  Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

### 2.    *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence.  *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).  "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown*, 192 F.3d at 496.

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present."  *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002).  Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision.  *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).  The

court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.  *See Masterson*, 309 F.3d at 272.  In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve."  *Id.*

### C.    *ALJ's Determination*

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2.    An individual who does not have a "severe impairment" will not be found to be disabled.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5.    If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 704-05.  The claimant has the burden to prove disability under the first four steps.  *See Myers*, 238 F.3d at 619.  If claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  *See Masterson*, 309 F.3d at 272; *Greenspan*, 38 F.3d at 236.  If the Commissioner is able to verify that other work exists in significant numbers in the national economy

that the claimant can perform in spite of his existing impairments, the burden shifts back to the claimant to prove that he cannot, in fact, perform the alternate work suggested. *See Boyd*, 239 F.3d at 705. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See id*.

The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992). An individual claiming disability benefits under the Act has the burden to prove that he suffers from a disability as defined by the Act. *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). A claimant is deemed disabled under the Act only if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit. *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. §§ 404.1572(a)-(b), 416.972.

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3). "[A]n individual is 'under a disability, only if his impairments are of such severity that he is not only unable to do his previous work but cannot,

7

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'" *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)).  This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if he applied.  *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).  In the case at bar, when addressing the first four steps, the ALJ determined:

1.  The claimant met the insured status requirements of the Social Security Act through September 30, 2006.

2.  The claimant has not engaged in substantial gainful activity at any time relevant to this decision per his testimony and earnings record (20 C.F.R. §§ 404.1520(b) and 416.920(b)).

3.  The claimant has the following "severe" impairments: diabetes mellitus with neuropathy[3] and a major depressive disorder[4] (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically Listings 9.08 and 12.04 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the ALJ found that the claimant has the residual functional capacity to lift and/or carry 50 pounds occasionally and 25 pounds frequently (including upward pulling), stand and/or walk (with normal breaks) about 6 hours in an 8-hour workday, sit (with normal breaks) about 6 hours in an 8-hour workday, and push and/or pull (including operation of hand and/or foot controls) without limitation. He

---

[3] "Diabetic neuropathy" is any of several types of peripheral neuropathy occurring with diabetes mellitus; there are sensory, motor, autonomic, and mixed varieties. The most common kind is a chronic symmetrical sensory polyneuropathy affecting first the nerves of the lower limbs and often affecting autonomic nerves. *See* DORLAND'S, *supra*, at 1212.

[4] " Major depressive disorder" denotes a mood disorder characterized by the occurrence of one or more major depressive episodes and the absence of any history or manic, mixed, or hypomanic episodes. *See* DORLAND'S, *supra*, at 530.

can understand, remember, and carry out detailed but not complex job instructions, use judgment, respond appropriately to supervision, coworkers, and usual work situations, and deal with changes in a routine work setting.

6.     The claimant is capable of performing past relevant work as a line attendant/stocker. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. §§ 404.1564 and 416.965).

7.     The Claimant has not been under a "disability," as defined in the SSA, from February 1, 2002 through the date of the ALJ decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

(R. 27-30). Because the ALJ found that Ellis could perform his past relevant work, the ALJ did not proceed to step five of the sequential evaluation process.

This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). To determine whether the decision to deny Ellis' claim for disability benefits is supported by substantial evidence, the court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the claimant's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the claimant's age, educational background, and work history. *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)). Any conflicts in the evidence are to be resolved by the ALJ and not the court. *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

9

D.      *__Issues Presented__*

Ellis contends that the decision of the ALJ is not supported by substantial evidence. Specifically, Ellis claims that the ALJ erred by:  (1) failing to grant controlling weight to the treating physician's medical opinion; (2) failing to find that Ellis met the requirements for disability under Listing 12.04 for affective disorders; and (3) failing to consider the plaintiff's exertional and non-exertional limitations.   *See* Docket Entry No. 14.   The Commissioner disagrees with Ellis' contentions, maintaining that the ALJ's decision is supported by substantial evidence.  *See* Docket Entry No. 15.

E.      *__Review of ALJ's Decision__*

1.      *__Objective Medical Evidence and Opinions of Physicians__*

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work."  *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990).  If the claimant is not actually working and his impairments match or are equivalent to one of the listed impairments, he is presumed to be disabled and qualifies for benefits without further inquiry.  *See id*. at 532; *see also* 20 C.F.R. § 416.920(d).   When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."  42 U.S.C. § 423(d)(2)(B); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).  The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your

10

> impairments without regard to whether any such impairment, if considered
> separately, would be of sufficient severity.  If we do find a medically severe
> combination of impairments, the combined impact of the impairments will be
> considered throughout the disability determination process.  If we do not find that
> you have a medically severe combination of impairments, we will determine that you
> are not disabled.

20 C.F.R. §§ 404.1523, 416.923; *see also Loza*, 219 F.3d at 393.  The ALJ must address the degree

of impairment caused by the combination of physical and mental medical problems.  *See Gibson v.*

*Heckler*, 779 F.2d 619, 623 (11th Cir. 1986) (citations omitted).  The medical findings of the

combined impairments are compared to the listed impairment most similar to the claimant's most

severe impairment.  *See Zebley*, 493 U.S. at 531.

     The claimant has the burden to prove at step three that his impairment or combination of

impairments is equivalent to or greater than a listed impairment.  *See id.* at 530-31; *Selders*, 914 F.2d

at 619.  The listings are descriptions of various physical and mental illnesses and abnormalities, most

of which are categorized by the body system they affect.  *See Zebley*, 493 U.S. at 529-30.  Each

impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results.

*See id.* at 530.  For a claimant to demonstrate that his disorder matches an Appendix 1 listing, it must

meet *all* of the specified medical criteria.  *See id*. (emphasis in original).  An impairment, no matter

how severe, does not qualify if that impairment manifests only some of the specified criteria.  See id.

     For a claimant to qualify for benefits by showing that his unlisted impairment, or

combination of impairments, is equivalent to a listed impairment, he must present medical findings

equal in severity to *all* the criteria for the one most similar listed impairment.  *See id.* at 531 (citing

20 C.F.R. § 416.926(a)).  A claimant's disability is equivalent to a listed impairment if the medical

findings are at least equal in severity and duration to the listed findings.  *See* 20 C.F.R.

§§ 404.1526(a), 416.926(a).  The applicable regulations further provide:

> (1)(I)   If you have an impairment that is described in the Listing of Impairments in
> Appendix 1 of Subpart P of this chapter, but—
>
> >   (A)   You do not exhibit one or more of the medical findings specified in
> >   the particular listing, or
> >
> >   (B)   You exhibit all of the medical findings, but one or more of the
> >   findings is not as severe as specified in the listing;
>
> (ii)    We will nevertheless find that your impairment is medically equivalent to that
> listing if you have other medical findings related to your impairment that are
> at least of equal medical significance.

20 C.F.R. §§ 404.1526(a), 416.926(a).  Nonetheless, "[a] claimant cannot qualify for benefits under

the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or

combination of impairments is as severe as that of a listed impairment."  *Zebley*, 493 U.S. at 531.

Ultimately, the question of equivalence is an issue reserved for the Commissioner.  *See Spellman v.

Shalala*, 1 F.3d 357 (5th Cir. 1993); 20 C.F.R. §§ 404.1527(e), 416.927(e).

A review of the medical records submitted in connection with Ellis' administrative hearing

reveals a history of alleged chronic pain, diabetes mellitus, hypertension, and pedal edema.  On April

30, 2002, Ellis was admitted into the emergency room, treated for a right ankle strain/sprain, and

released.  (R. 202).  On July 14, 2003, Ellis presented to Kavita Shah Patel, M.D. ("Dr. K. Patel"),

with pain in his legs and in his right arm.  (R. 199).  Ellis reported that he had completed his

hypertension medication and needed refills.  (R. 199).  Dr. K. Patel assessed Ellis with cellulitis.

(R. 199).

A progress note indicated that on July 22, 2003, Ellis presented to the nursing triage center at the Veteran's Administration ("VA") Hospital with complaints of hypertension, abrasion, and cellulitis. (R. 198). The note further indicated that Ellis was about to run out of medication and had blacked out the day before. (R. 198). The physician, Gustavo Camacho-Del Rio, M.D. ("Dr. Camacho-Del Rio"), returned Ellis to the clinic to be evaluated. (R. 198). Ellis reported that the medications had been successful at lowering his blood pressure. (R. 197). Maynard Pang, M.D. ("Dr. Pang"), subsequently, diagnosed Ellis with hypertension and depression. (R.197).

In a progress note dated May 25, 2004, Ellis presented to the mental health triage center, complaining of having made "wrong turns in [his] life." (R. 185). During the mental examination, Ismael Carlo, M.D. ("Dr. Carlo"), noted that Ellis was alert, well oriented and in good contact with reality. (R. 186). His thoughts were coherent and relevant, and there was no looseness of association. (R. 186). At that time, Ellis was not delusional, had no active hallucinations, and denies any suicidal or homicidal ideas. (R. 186). Dr. Carlo noted that Ellis' memory and intellect were well preserved, his sensorium was clear, and his insight and judgment were fair. (R. 186). Dr. Carlo did, however, note that Ellis' affect was of depression and his mood was depressed. (R. 186). Dr. Carlo diagnosed Ellis with major depression.  (R. 186).

In an exercise and weight assessment dated May 25, 2004, the progress notes indicated that Ellis' weight was excessive for his height. He was advised to increase daily activity with walking daily for 30 minutes, to decrease the amount of junk food or fast food consumed. (R. 187). Additionally, with regard to his mental health, Dr. Carlo assigned Ellis a Global Assessment of

13

Functioning ("GAF") rating of 45.[5]  (R.187).  The progress note indicated that Ellis was, at the time, under treatment and/or counseling for an active diagnosis of depression.  (R.187).

During an exercise and weight assessment performed on May 28, 2004, nurse Jewel D. Thornton ("Thornton") noted that Ellis' weight continued to be excessive for his height and was advised to decrease the amount of junk food or fast food he consumed.  (R. 184).  Progress notes also indicated that Ellis continued to use tobacco; and was encouraged to stop all tobacco use after the risks of such use were discussed.  (R. 184).  On the same day, during a primary care follow-up, Ellis presented to Jayendra Patel, M.D. ("Dr. J. Patel"), complaining of elevated blood pressure, a burning sensation in his right foot, and intermittent lower back pain.  (R. 182-183).  Dr. J. Patel noted that Ellis' right heel pain seemed to be secondary to neuropathy.[6] (R. 182).  Additionally, Dr. J. Patel noted Ellis' hypertension due to his elevated blood pressure.  (R. 182).

During a primary care visit on August 30, 2004, Ellis presented to Dr. J. Patel with swelling in both legs and burning pain on the bottom of his feet.  (R. 180).  Dr. J. Patel noted that Ellis continued to smoke one-pack of cigarettes per day.  (R. 180).  A complete diabetic foot examination

---

[5]  A GAF score represents a clinician's judgment of an individual's overall level of functioning.  *See* AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV-TR") 32 (4th ed. 2000).  The reporting of overall functioning is done by using the GAF Scale, which is divided into ten ranges of functioning—*e.g.*, 90 (absent or minimal symptoms) to 1 (persistent danger of severely hurting self or others, or unable to care for himself).  The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range. Lower GAF scores signify more serious symptoms.  A GAF rating of 45 indicates a " serious" impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).  *See id* at 34.

[6]  "Neuropathy" refers to a functional disturbance or pathological change in the peripheral nervous system, sometimes limited to noninflammatory lesions as opposed to those of neuritis; the etiology may be known or unknown. *See* DORLAND'S, *supra*, at 1212.

was performed, in which Dr. J. Patel noted pedal[7] edema[8] on Ellis' feet.  (R. 180).  Dr. J. Patel assessed Ellis with diabetes mellitus with peripheral neuropathy, edema in the legs, and hypertension.  (R. 180).

On November 2, 2004, Ellis presented to staff psychiatrist Rayan K. Al Jurdi, M.D. ("Dr. Al Jurdi"), complaining of depression.  (R. 171-174).  It was noted that Ellis was previously prescribed Celexa, a depression medication, but only took it for one month.  (R. 171).  Ellis claimed that he did not know he needed to take the medication.  (R. 171).  He reported feeling "low" since 1999, when he sustained cardiac arrest due to anesthesia.  (R. 171).  Ellis advised that he had no appetite, however, his weight was increasing.  (R. 171).  Ellis reported that was experiencing manic symptoms, however, they did not interfere with his daily life.  (R. 171).  Ellis denied having psychotic symptoms, including hearing voices or seeing things or having panic symptoms.  (R. 172). Dr. Al Jurdi noted that Ellis' psychomotor activity was unremarkable, his speech was of unremarkable rate, tone, volume, and of fluent rhythm, his affect was stable and appropriate, and his thoughts were goal-directed, with no suicidal or homicidal ideations.  (R. 173).  According to Dr. Al Jurdi, Ellis expressed no symptoms of psychosis.  (R. 174).  Dr. Al Jurdi opined that Ellis' symptoms were of depression and possible hypomanic episodes.  (R. 174).  Dr. Al Jurdi emphasized the need for medication compliance, noting that Ellis had been on 3 anti-depressants in the past month, none of which he was compliant.  (R. 174).

---

[7]  "Pedal" is a term pertaining to the foot or feet.  *See* DORLAND'S, *supra*, at 1340.

[8]  "Edema" refers to the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body, usually referring to demonstrable amounts in the subcutaneous tissues. It may be localized, due to venous or lymphatic obstruction or increased vascular permeability, or systemic, due to heart failure or renal disease. *See* DORLAND'S, *supra*, at 567.

On November 2, 2004, Ellis completed a psychosocial assessment with social worker Loretta A. Coonan, LCSW ("Coonan").  (R. 165-171).  When Coonan questioned Ellis on what he needed most help with at the present time, Ellis noted that he was very much concerned with his current social situation—that is, his inability to obtain social security benefits and his unemployment.  (R. 165).  The progress note indicates that Ellis enjoys carpentry and also enjoys participating in ministry.  (R. 168).  Additionally, Coonan noted that Ellis had no barriers to learning and identified no limitations.  (R. 170).

On November 29, 2004, Ellis presented to Dr. J. Patel for a follow-up visit for hypertension and pain in his arms and lower back.  (R.160).  At that time, Ellis' blood pressure was 156/107; thus, Dr. Patel continued Ellis' hypertension medication.  (R.160).  In an addendum, it was noted that Ellis' diabetes mellitus was "well controlled." (R.161).  Dr. Patel further noted that Ellis' height was 70 inches, and his weight was 251 lbs.  (R. 160).  On the same day, during an exercise and weight assessment, nurse Thornton noted that Ellis' weight was excessive for his height, that Ellis continued to use tobacco despite warnings and encouragement to stop, and that Ellis refused the influenza vaccine.  (R. 162).

The following day, on November 30, 2004, progress notes indicate that Ellis presented Dr. Al Jurdi for a follow-up visit.  (R. 157-159).  During a mental examination, Dr. Al Jurdi noted that Ellis' psychomotor activity was unremarkable and that his speech was of unremarkable rate, tone, volume, and fluent rhythm.  (R. 158).  Additionally, Dr. Al Jurdi reported that Ellis' affect was stable and appropriate, his thoughts were goal oriented with no suicidal or homicidal ideations, and expressed no evidence of psychosis.  (R. 158).  Ellis, however, advised Dr. Al Jurdi that his mood

was depressed.  (R. 158).  Dr. Al Jurdi further noted that Ellis refused to enter a referral group for anger management or bipolar disorder because of transportation issues.  (R. 159).

On December 28, 2004, John R. Wiley, M.D. ("Dr. Wiley") completed a physical residual functional capacity assessment, reporting that Ellis could lift and/or carry 50 pounds occasionally; lift and/or carry 25 pounds frequently; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; push and/or pull without limitations; and had no postural, manipulative, visual, communicative, or environmental limitations.  (R. 130-135).  Dr. Wiley concluded that Ellis' alleged limitations due to his symptoms were not fully supported by the medical evidence on record.  (R. 135).

On December 30, 2004, Mehdi Sharifian, M.D. ("Dr. Sharifian"), completed a mental functional capacity assessment, concluding that Ellis was either moderately limited or not significantly limited in all areas.  (R. 126-127).  Dr. Sharifian noted that Ellis could understand, remember, and carry out detailed but not complex instructions, make decision, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in a routine work setting.  (R. 128).  On that same date, Dr. Sharifian completed a psychiatric review technique form, assessing Ellis' alleged depression.  (R. 110-125).  According to Dr. Sharifian, Ellis was moderately limited; however, he did not meet the "C" criteria for listing 12.04.[9]  (R. 120-121).

---

[9]Listing 12.04(C) provides as follows:

Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
1.    Repeated episodes of decompensation, each of extended duration; or
2.    A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the

Dr. Sharifian noted that Ellis showed "no evidence of psychosis." (R. 123). Dr. Sharifian reported that Ellis' main focus seemed to be getting disability approved by possibly claiming that his medications were not working. (R. 124). He further noted that Ellis never refilled his medications despite stating that he had, and noted that Ellis was "<u>NOT</u> believable!" (R. 124) (emphasis in original). Dr. Sharifian reported that Ellis not a credible source and that no further psychiatric investigation was warranted. (R. 125).

In a mental status examination performed on January 31, 2005, Dr. Al Jurdi noted that Ellis' psychomotor activity was unremarkable. (R. 155). Additionally, Ellis' speech was reported as unremarkable in rate, tone, volume and of fluent rhythm. (R. 155). Ellis' thoughts were observed to be goal oriented, having no suicidal or homicidal ideation. (R. 156). Dr. Al Jurdi further noted that Ellis expressed no evidence of psychosis. (R. 156). Dr. Al Jurdi reported Ellis' failure to comply with his medical regimen. (R. 156). He further noted that Ellis consistently gave inaccurate information, such as stating that he was taking his medication and that he had completed his blood tests, when in fact he had not. (R. 155-156). He further noted that Ellis' main focus seemed to be getting disability benefits approved by claiming that his medications were not working. (R. 156).

Progress notes indicate that on April 27, 2005, Ellis presented to physician assistant Donald Barnes ("Barnes"). (R. 142-145). Barnes noted Ellis' active problems as bipolar disorder, mixed

---

environment would be predicted to cause the individual to decompensate; or

3.      Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

*See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04.

hyperlipidemia,[10] hypertension,[11] and obesity.[12]  (R. 142).  At that time, Ellis' blood pressure was

calculated at 147/84.  (R. 143).  Additionally, Barnes noted that Ellis had not been compliant with

his hypertension or diabetes mellitus medication.  (R. 143).  The physician subsequently urged Ellis

to take his medication as directed.  (R. 145).  On the same day, Dr. Al Jurdi noted in a progress note

that Ellis reported feeling dizzy after taking his medication.  (R. 148-150).  Ellis advised that he

stopped taking his medication after 12 pills and restarted taking his old depression medication

regularly.  (R. 148).  Computer records, however, indicated that Ellis had not refilled either his

current or old medications since November 2004, despite claiming to take two pills per day.  (R.

148).  Dr. Al Jurdi further noted that Ellis did not complete his scheduled labs.  (R. 148).

On June 27, 2005, Dr. Al Jurdi conducted a mental status examination noting that Ellis'

psychomotor activity was unremarkable.  (R. 149).  Additionally, Ellis' speech was reported as

unremarkable in rate, tone, volume and of fluent rhythm.  (R. 149).  Ellis' thoughts were goal

oriented, having no suicidal or homicidal ideation.  (R. 149).  There was also no evidence of

psychosis.  (R. 149).  Dr. Al Jurdi noted Ellis' failure to comply with his medical regimen.  (R. 149-

150).

---

[10]  "Hyperlipidemia" is a general term for elevated concentrations of any or all of the lipids in the plasma.
*See* DORLAND'S, *supra*, at 852.

[11]  "Hypertension" is high arterial blood pressure. It may have no known cause or be associated with other
primary diseases.  *See* DORLAND'S, *supra*, at 858.

[12]  " Obesity" refers to an increase in body weight beyond the limitation of skeletal and physical
requirement, as the result of an excessive accumulation of fat in the body.  *See* DORLAND'S, *supra*, at
1251

On August 1, 2005, Ellis presented to Dr. J. Patel complaining of headaches, dizziness, blurred vision, and feelings of weakness.  (R.139).  A complete diabetic foot exam was performed, and the skin and nails were intact without lesions or other problems.  (R.139).

On March 21, 2006, Dr. J. Patel noted that Ellis' continued to have hypertension due to an elevated blood pressure.  (R. 285).  At that time, his blood pressure was 171/92.  (R. 285).  Dr. J. Patel noted that Ellis was not taking his medications regularly, and educated him about medicinal compliance, dietary modifications, and exercise and weight loss.  (R. 285).

On March 21, 2006, nurse Deborah D. Baker, LVN ("Baker"), conducted the "Morse Fall Scale," a risk assessment scale, on Ellis.  (R. 286).  Baker determined that Ellis scored a 15; hence, he was not a risk and needed no further assessment.  (R. 286).  A score of 45 or less indicates no further assessment is needed.  (R. 286).  During the standardized test, it was determined that Ellis had no history of falling.  (R. 286).  Additionally, it was noted that Ellis used or had continued to use tobacco within the past year and was once again encouraged to halt the use of tobacco.  (R. 286).

One month later, on April 21, 2006, Ellis reported to nurse Thornton a pain score of "0." (R. 283).  Additionally, the Morse Fall Scale was conducted again, he scored a 15, and Ellis was ruled not to be a risk for falling.  (R. 283).  On the same day, Ellis presented to Dr. J. Patel for a primary care follow-up concerned with dyspnea.[13]  (R. 281).  Dr. J. Patel noted that Ellis' was obese, that his blood pressure was elevated, and that he was not complying with his blood pressure medication.  (R. 282).  Dr. J. Patel advised Ellis to restart taking the medication and to comply with his other medication regimens.  (R. 282).

---

[13] "Dyspnea" refers to breathlessness or shortness of breath; difficult or labored breathing.  *See* DORLAND'S, *supra*, at 558.

On June 22, 2006, Ellis presented to the nursing triage center with complaints of knots and redness near his right ankle that had been lasting 3 weeks and swelling of the back of the thigh lasting 3 weeks. (R. 278). Additionally, Ellis presented to Ahsan Khan, M.D. ("Dr. Khan"), for a follow-up of right ankle and left popliteal[14] pain. (R. 272). Dr. Khan observed Ellis was a pleasant, obese male that appeared older than his stated age. (R. 273). Ellis received a vascular carotid ultrasound, in which he was provisionally diagnosed with occlusion and stenosis of the carotid artery, without cerebral infarction.[15] (R. 292).

In a letter dated June 23, 2006, Dr. Al Jurdi wrote to Clara Ellis, Ellis' wife, that based on his evaluation, Ellis' diagnosis was more likely than not bipolar disorder rather than depression. (R. 270). According to Dr. Al Jurdi, the impact of Ellis' manic/hypomanic symptoms on his daily routines were unclear because Ellis tended to give conflicting reports about their significance in his daily life. (R. 270). Dr. Al Jurdi further noted that Ellis had continued to be generally non-compliant with his treatment regimen. (R. 270).

On June 30, 2006, Dr. Ahsan issued Ellis a knee brace with a provisional diagnosis of degenerative joint disease. (R. 288).

On July 6, 2006, Dr. Al Jurdi explained to Ellis that his non-compliance with his medication and several claims that he was taking it regularly, when the record indicated that he had not renewed his medications for months, work against a disability claim. (R. 266-268). Ellis claimed that he had been taking half of his suggested medication dose. (R. 266). Dr. Al Jurdi reported, however, that

---

[14] "Popliteal" refers to the posterior surface of the knee. *See* DORLAND'S, *supra*, at 1437.

[15] "Cerebral Infarction" refers to an ischemic condition of the brain, producing local tissue death and usually a persistent focal neurological deficit in the area of distribution of one of the cerebral arteries. *See* DORLAND'S, *supra*, at 895.

his medication could not have lasted him the entire time.  (R. 266).  Dr. Al Jurdi noted that "[t]he relation was more strained by patient[] continuous claims that he is compliant with meds when records indicated the opposite."  (R. 267).  Dr. Al Jurdi further noted that a review of Ellis' symptoms was more suggestive of bipolar disorder rather than depression.  (R. 267).  According to Dr. Al Jurdi, Ellis was often more focused about his disability claim related to his mental illness rather than getting better.  (R. 267).  Dr. Al Jurdi opined that Ellis' bipolar symptoms were severe and that he needed treatment.  (R. 268).  Dr. Al Jurdi reported that because most of their encounter was focused on discussing his compliance with treatment rather than his response, Dr. Al Jurdi noted that it was difficult to evaluate how disabling was his mental illness.  (R. 268).  Finally, Dr. Al Jurdi noted that Ellis initially denied that his manic phase was affecting his functionality; however, later Ellis claimed it did.  (R. 268).  Dr. Al Jurdi reported that no diagnosis of bipolar disorder can be made if manic symptoms are not causing a negative effect on the patient's daily social and occupation functioning.  (R. 268).  Dr. Al Jurdi advised that, at that point in time, he could not write a letter supporting Ellis' disability claims.  (R. 268).

On July 11, 2006, Ellis presented to Dr. J. Patel with right leg edema and pain in both legs. (R. 263).  Dr. Patel conducted a diabetic foot exam, and found that Ellis continued to have pedal edema and had some loss of protective sensation in his feet, along with decreased pulses in his feet. (R. 263).  Dr. J. Patel additionally assessed Ellis with cellulitis.  (R. 263).  Dr. Patel noted that Ellis' blood pressure was elevated at 152/107.  (R. 263).  Additionally, Dr. Patel reported Ellis' weight as 270 lbs.  (R. 163).  On the same day, Ellis reported to nurse Thornton during an outpatient pain screen a pain score of "0."  (R. 264).  Nurse Thornton additionally noted that Ellis' weight was excessive for his height.  (R. 264).

22

On July 25, 2006, Ellis presented to M.R. Prabhu, M.D. ("Dr. Prabhu"), requesting a second opinion regarding his diagnoses of depression and bipolar disorder. (R. 332). It was noted by Dr. Prabhu, who is not part of the medical staff at the VA Hospital, that Ellis continued to smoke two pack of cigarettes per day. (R. 332). Dr. Prabhu assigned Ellis a GAF rating of 50.[16] (R. 331). Dr. Prabhu additionally observed that Ellis' speech was spontaneous, his thought process was goal-directed, he had no delusions, or suicidal or homicidal ideations, he was oriented by three and was of average intelligence. (R. 331, 333). Furthermore, Dr. Prabhu indicated that Ellis had fair immediate recall, judgment, recent and remote memory, concentration, and insight. (R. 333). Dr. Prabhu diagnosed Ellis with major depressive disorder, recurrent, R/O bipolar disorder. (R. 334). The record indicates that this was the only time Ellis visited Dr. Prabhu for any medical reasons.

"[O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985). "[T]he opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight" in determining disability. *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981); *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985). "Generally, the longer a treating source has treated [the claimant] and the more times [the claimant

---

[16] A GAF rating of 50 indicates a "serious" impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job); whereas, a GAF rating of 55 indicates a "moderate" impairment in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or coworkers). *See* DSM-IV-TR, *supra*, at 34.

has] been seen by a treating source, the more weight [the SSA] will give to the source's medical

opinion." 20 C.F.R. §§ 404.1527(d)(2)(I); 416.927(d)(2)(I).  Medical opinions are given deference,

however, only if those opinions are shown to be more than conclusory and supported by clinical and

laboratory findings.  *See Scott*, 770 F.2d at 485.  Moreover, a treating physician's opinions are far

from conclusive and may be assigned little or no weight when good cause is shown.  *See Myers*, 238

F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237.

Good cause may permit an ALJ to discount the weight of a treating physician's opinion in

favor of other experts when the treating physician's evidence is conclusory, unsupported by

medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by

the evidence.  *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456; *see also Brown*, 192 F.3d at

500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211.  It is well settled that even though the opinion

and diagnosis of a treating physician should be afforded considerable weight in determining

disability, the ALJ has sole responsibility for determining a claimant's disability status.  *See Paul*,

29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

Ellis next argues that he meets the requirements for disability under Listing 12.04 (affective

disorders).  *See* Docket Entry No. 14.  Ellis contends that he has marked limitation with respect to

maintaining social functioning and difficulties in maintaining concentration, persistence or pace;

however, the record does not support this assertion.  Contrary to Ellis' contention, there is substantial

evidence in the record to support the ALJ's determination that Ellis suffered from impairments

which did not meet or equal the requirements of Listing 12.04.  (R. 27).  Ellis failed to demonstrate

that he had marked limitations of functioning in two areas.  *See* 20 C.F.R. Pt. 404, Subpt. P, App1,

Listing 12.04.  The ALJ properly noted that the state agency physician, Dr. Sharifian, concluded that

24

Ellis had moderate restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate deficiencies of concentration, persistence, or pace, and no episodes of deterioration or decompensation.  (R. 29, 120).

Indeed, Ellis' mental status examinations were unremarkable.  (R. 29, 144, 155-156, 158, 173-174).  A review of the aforementioned evidence indicates that on November 2, 2004, November 30, 2004, and January 31, 2005, Dr. Al Jurdi, Ellis' treating VA psychiatrist, noted that while Ellis' mood was depressed, his speech and psychomotor activity were unremarkable, his affect was stable and appropriate, his thoughts were goal-directed, he had no suicidal or homicidal ideations, hallucinations or delusions, and no evidence of psychosis existed.  (R. 158, 156-156,173-174).  Similarly, on July 25, 2006, Dr. Prabhu reported that, although Ellis was depressed, his speech was spontaneous, his thought process was goal-directed, he had no delusions, and his immediate recall, recent and remote memory, and concentration were fair.  (R. 333).

Furthermore, the record is replete with evidence that indicates that Ellis was non-compliant with his depression and hypertension treatment programs.  (R. 124, 143, 148, 149-150, 156, 171, 174, 266-268, 270, 282, 285).  Medical impairments that reasonably can be remedied or controlled by medication or treatment are not disabling.  *See Johnson v. Bowen*, 846 F.2d 340, 348 (5th Cir. 1988).  Likewise, a claimant's failure to comply with his prescribed regimen of treatment constitutes one element an ALJ may consider in denying disability.  *See Johnson v. Sullivan*, 894 F.2d 683, 695 n.4 (5th Cir. 1990); 20 C.F.R. §§ 404.1530(b), 416.930(b).  In fact, both Drs. Sharifian and Al Jurdi reported that Ellis' main focus seemed to be getting disability approved by possibly claiming that his medications were not working.  (R. 124, 156).  On July 6, 2006, Dr. Al Jurdi advised Ellis that his non-compliance with his medical regimens worked against a disability claim.  (R. 266).  In light

25

of the circumstances, Dr. Al Jurdi reported that he could not write a letter in support of Ellis' disability claim.  (R. 268).

Ellis also argues that the GAF assessments of 45 and 50 are important indicators that show he was disabled.  *See* Docket Entry No. 14.  As an initial matter, Ellis' treatment notes fail to indicate that he had "serious" symptoms, as would be associated with a GAF rating of 41-50.  (R. 120, 126, 127, 149, 156, 158, 173, 186, 331, 333).  For example, Dr. Carlo noted in May 2004, that Ellis had a depressed mood and affect, his memory and intellect were well preserved, his sensorium was clear, and he was alert, well-oriented, and in good contact with reality.  (R. 186).  Dr. Carlo found that Ellis had coherent and relevant thoughts, no looseness of association, no delusions or active hallucinations, and no suicidal or homicidal ideas.  (R. 186).  He further opined that Ellis had fair insight and judgment and that he had good personal hygiene and grooming.  (R. 186).  Thus, Dr. Carlo's mostly normal findings on Ellis' mental status examination are inconsistent with his finding that Ellis had a GAF rating of 45.  (R. 186). An ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion.  *See Martinez v. Chapter*, 64 F.3d 172, 176 (5th Cir. 1995).

Similarly, Dr. Prabhu's mostly normal findings on Ellis' mental status examination are internally inconsistent with his finding that Ellis had a GAF rating of 50.  (R. 331, 333).  Dr. Prabhu observed that Ellis' speech was spontaneous, his thought process was goal-directed, he had not delusions or suicidal or homicidal ideations, he was oriented by three, and was of average intelligence.  (R. 331, 333).  Dr. Prabhu also reported that Ellis had fair immediate recall, judgment, recent and remote memory, concentration, and insight.  (R. 333).  As such, Dr. Prabhu's GAF assessment is internally inconsistent with his findings.  It is the ALJ's responsibility to resolve

conflicting medical opinions. *See Masterson*, 309 F.3d at 272. Here, to the extent the ALJ discounted Drs. Carlo and Prabhu's opinions, sufficient evidence supports the ALJ's decision.

In any event, no physician has indicated that Ellis' GAF score impaired his ability to work. "[T]he score, standing alone, without further explanation, does not establish an impairment severely interfering with an ability to perform basic work activities." *Eden v. Barnhart*, 109 Fed. Appx. 311, 314 (10th Cir. 2004); *see also Camp v. Barnhart*, 103 Fed. Appx. 352, 354 (10th Cir. 2004). Consequently, Substantial evidence supports the ALJ's analysis of Ellis' mental health evidence

### 2.      *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints. *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)). When a plaintiff alleges disability resulting from pain, he must establish a medically determinable impairment that is capable of producing disabling pain. *See Ripley*, 67 F.3d at 556 (citing 20 C.F.R. § 404.1529). Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity. *See id.* It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference. *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128. The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand. *See Falco*, 27 F.3d at 164 n.18. Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings." *Harrell v.*

*Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529;

*Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522

(citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d

1308, 1309 (5th Cir. 1986).

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does

not mandate a finding of disability.  *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267,

1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986).  Additionally,

the mere existence of pain does not automatically bring a finding of disability.  *Harper v. Sullivan*,

887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281.  It must be determined whether substantial

evidence indicates an applicant can work despite being in pain or discomfort.  *See Chambliss*, 269

F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly

unresponsive to therapeutic treatment."  *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*,

925 F.2d at 128.  The decision arising from the ALJ's discretion to determine whether pain is

disabling is entitled to considerable deference.  *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at

128; *James*, 793 F.2d at 706.  However, an ALJ may discount subjective complaints of pain as

inconsistent with other evidence in the record.  *See Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir.

2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

At the administrative hearing, Ellis testified regarding his complaints of pain, episodes of

suddenly falling, high blood pressure, and mental limitations.  (R. 349-376).  The ALJ's decision

indicates that the ALJ did consider objective and subjective indicators related to the severity of Ellis'

pain, episodes of suddenly falling, high blood pressure, and mental limitations:

28

The claimant alleged migraine headaches with pain in the left side and top fo the head, blurred vision, and dizziness, pain the lower back that is aggravated by lifting, standing, sitting, and walking, pain in both legs with swelling in the ankles that sometimes lasts all day and causes him to lose his balance and fall, chest pain, shortness of breath, diabetes, high blood pressure, and depression with mood swings and angry outbursts.  At the hearing, he also alleged cellulitis of the right leg.  He contended that he feels worthless, likes to keep to himself, and hears voices daily.

Regarding his activities of daily living, he testified that he needs some help with hygiene such as getting in and out of [the] tub and combing [his] hair because his hands lock up from muscle spasms for 5 to 10 minutes twice a month.  After using the bathroom, he prays, reads the Bible, watches television including the news, sits in his chair in his room, and helps with the laundry or cleaning up around the house.  He does not socialize much.  He contended that he cannot lift and carry a gallon of milk.  He can stand for 15 to 20 minutes, sit for a couple of hours, and walk from room to room with his walker; he stated that he could previously walk a half a block but that it was painful from his back to his feet when walking without the walker.

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, duration, and limiting effects of these symptoms are not entirely credible.

(R. 28).  The ALJ's findings are supported by the medical records.

Statements about pain or other symptoms alone will not establish that a person is disabled; there must be medical signs and laboratory findings which show that a claimant has a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged.  *See* 20 C.F.R. §§ 404.1529(a), 416.929(a).  Treatment notes are inconsistent with Ellis' allegations regarding pain.  On April 21 and July 11, 2006, Ellis reported a pain score of "0."  (R. 29, 264, 283).  Indeed, progress notes further indicate some pain and swelling in the ankle and lower extremities but no peripheral nerve dysfunction, neurological deficits, or retinopathy.  (R. 154, 272, 273, 289).  Ellis noted that his pain level had been acceptable with no discomfort.  (R. 264, 284).  Additionally, physical examinations of Ellis have been unremarkable with no neurological deficits and a normal

gait.  (R. 144, 146-147, 193, 282, 283, 256).  Contrary to Ellis' testimony at the hearing, in which he detailed his problems with suddenly falling as if his legs were not there, the record shows that Ellis has not history of falling.  (R. 283, 286, 146-147).  Although a June 2006 note indicates a request for a knee brace due to a provisional diagnosis of degenerative joint disease (R. 288), there is only evidence of left knee crepitus with normal gait and station as indicated.  (R. 273).  Consequently, the medical records contradict Ellis' assertion regarding his pain.  *See Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989) (subjective complaints must be corroborated, at least in part, by objective evidence).

With respect to Ellis' mental limitations, mental status examinations were unremarkable. (R. 155-156, 158, 173-174, 333).  The ALJ did not give credence to Ellis' statements that he was functionally limited beyond the mental limitations the ALJ placed in the RFC.  Evidence on record, such as Ellis' inconsistent statements about taking his medications when he was not refilling them, supports the ALJ's finding that Ellis was not credible.  (R. 28, 124, 148, 155-156, 171, 266). "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."  *See* SSR 96-7p.  Dr. Sharifian went so far as to conclude in his evaluation that Ellis was "NOT believable! He never refilled his med[ication]s despite telling [physicians] he did."  (R. 124) (emphasis in original).  Therefore, the ALJ properly discredited Ellis' statements regarding the functional limitations his depression allegedly caused.

Additionally, Ellis has been oriented.  (R. 146-147, 283-286).  Ellis' credibility also has been discounted due to his consistent non-compliance with medical regimens, despite claiming compliance.  (R. 149, 155-156, 266-267, 270).  Even his treating psychiatrist, Dr. Al Jurdi, would not write a letter supporting Ellis' disability claim.  (R. 268).

The Court does not doubt that Ellis suffers from pain; however, the records do not support a finding that Ellis' pain is constant, unremitting, and wholly unresponsive to therapeutic treatment. *See Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.  Accordingly, there is substantial evidence that supports the ALJ's finding that Ellis' subjective reports of pain do not rise to the level of disability. Furthermore, the record supports the ALJ's decision in determining that Ellis' statements concerning his episodes of sudden falling and mental limitations are not fully credible.

### 3.   *Residual Functional Capacity*

Under the Act, a person is considered disabled:

> . . . only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for his, or whether he would be hired if he applied for work. . . .

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  The Commissioner bears the burden of proving that a claimant's functional capacity, age, education, and work experience allow h[im] to perform work in the national economy.  *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236.  If the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that he cannot perform the alternate work suggested.  *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

To determine whether an applicant can return to a former job or, if never employed, can perform substantial work in the national economy, the regulations require the ALJ to evaluate the applicant's residual functional capacity ("RFC"). *See Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983) (citing 20 C.F.R. §§ 404.1561, 416.961). This term of art merely designates the ability to work despite physical or mental impairments. *See id.*; *see also* 20 C.F.R. §§ 404.1545, 416.945. "Residual functional capacity" combines a medical assessment with the descriptions by physicians, the applicant or others of any limitations on the applicant's ability to work. *See id.* When a claimant's RFC is not sufficient to permit him to continue his former work, then his age, education, and work experience must be considered in evaluating whether he is capable of performing any other work. *See* 20 C.F.R. §§ 404.1561, 416.961. The testimony of a vocational expert is valuable in this regard, as "[she] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Carey*, 230 F.3d at 145; *see also Masterson*, 309 F.3d at 273; *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995); *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986). In the absence of contrary evidence, the ALJ may properly rely on the testimony of a vocational expert in reaching a conclusion regarding a claimant's RFC to perform work available in the national economy. *See Masterson*, 309 F.3d at 273.

In evaluating a claimant's residual functional capacity, the Fifth Circuit has looked to SSA rulings ("SSR"). *See Myers*, 238 F.3d at 620. The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See id.* (citing *B.B. ex rel. A.L.B. v. Schweiker*, 643 F.2d 1069, 1071 (5th Cir. 1981)). In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and the interplay of exertional and nonexertional factors. *See id.* In that case, the court explained:

First, SSR 96-8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule. The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . . RFC involves both exertional and non-exertional factors. Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately. In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. . . . The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474-01 (July 2, 1996). The court further commented:

Second, SSR 96-9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities. . . . The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50. Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996). The court also noted that SSR 96-9p defines "exertional capacity" as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated. *See id*. Thus, to determine that an applicant can do a given type of work, the ALJ must find that the applicant can meet the job's exertional and nonexertional requirements on a sustained basis and can maintain regular employment. *See Watson*, 288 F.3d at 218; *Singletary v. Bowen*, 798 F.2d 818, 821 (5th Cir. 1986); *Carter*, 712 F.2d at 142 (citing *Dubose v. Mathews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

When a claimant suffers only exertional impairments and an ALJ's findings of residual functional capacity, age, education, and previous work experience coincide with the grids, the Commissioner may rely exclusively on the medical-vocational guidelines to determine whether work exists in the national economy which the claimant can perform.  *See Newton*, 209 F.3d at 458 (citing *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987); 20 C.F.R. § 404.1569(b)).  Nevertheless, "use of the grid rules is only appropriate 'when it is established that the claimant suffers only from exertional impairments, or that the claimant's nonexertional impairments do not significantly affect his residual functional capacity.'"  *Watson*, 288 F.3d at 216 (quoting *Crowley*, 197 F.3d at 199); *accord Loza*, 219 F.3d at 398; *Newton*, 209 F.3d at 458.  If the claimant suffers from nonexertional impairments or a combination of exertional and nonexertional impairments, then the Commissioner must rely on a vocational expert to establish that suitable jobs exist in the economy.  *See id.* Therefore, before applying the grids, it must be determined whether nonexertional factors, such as mental illness, significantly affect a claimant's RFC.  *See Loza*, 219 F.3d at 399; *Newton*, 209 F.3d at 459.

Ellis argues that the ALJ failed to properly consider the combined effects of his alleged exertional and non-exertional impairments (*i.e.*, pain and swelling in extremities and mental impairments).  *See* Docket Entry No. 14.  Because Ellis alleges that he suffers from exertional and non-exertional impairments, it was proper for the ALJ to rely on a vocational expert to establish that suitable jobs exist in the economy.  *See Watson*, 288 F.3d at 216 (quoting *Crowley*, 197 F.3d at 199); *accord Loza*, 219 F.3d at 398); *Newton*, 209 F.3d at 458.  Here, the ALJ determined that Ellis could perform his past relevant work as a line attendant/stocker, which was medium, unskilled work. (R. 29, 378-379).

Although Ellis alleged he was limited in his activities of daily living (R. 352-353), the evidence of record supports the ALJ's finding that Ellis was not fully credible, and that the ALJ was in the best position to determine Ellis' credibility.  *See Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994) ("[t]he ALJ found the medical evidence more persuasive that the claimant's own testimony. . .[t]hese are precisely the kinds of determinations that the ALJ is best positioned to make.").  Additionally, as noted by the ALJ, Ellis' mental status examinations were unremarkable. (R. 29, 144, 155-156, 158, 173-174).  Ellis' treatment notes (physician progress notes), fail to indicate that he had "serious" mental limitations.  (R. 120, 126, 127, 149, 156, 158, 173, 186, 331, 333).  Moreover, both mental and physical RFC assessments conducted by state agency doctors, Drs. Wiley and Sharifian, concluded Ellis' alleged limitations due to his symptoms were not fully supported by the medical evidence on record. (R. 120-127, 130-135).  The ALJ compensated for Ellis' pain and other discomforts that the record supported by fashioning the RFC at the medium, rather than heavy, exertional work-level.  (R. 28-29).  In sum, the ALJ's determination that Ellis could return to his past work as a line attendent/stocker (medium, unskilled) is supported by substantial evidence.

## III.  *Conclusion*

Accordingly, it is, therefore

**ORDERED** that Ellis' Motion for Summary Judgment (Docket Entry No. 14) is **DENIED**. It is further

**ORDERED** that the Commissioner's decision denying disability benefits is **AFFIRMED**. Finally, it is

**ORDERED** that this matter is **DISMISSED** from the dockets of this Court.

**SIGNED** at Houston, Texas, on this the <u>19th</u> day of <u>August</u>, 2009.

Calvin Botley
United States Magistrate Judge